IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: | CASE NO. BK 21-40869-TLS |
| JASON MICHAEL STEPHENS and MICHELLE LEE STEPHENS, | CHAPTER 7 |
| Debtor(s). | ADV. NO. A21-4023-TLS |
| SHERI J. PALMER REVOCABLE TRUST and SHERI J. PALMER, Trustee, | **ORDER** |
| Plaintiff(s) | |
| vs. | |
| JASON MICHAEL STEPHENS, | |
| Defendants(s). | |

This matter is before the court on the plaintiffs' second amended complaint to determine dischargeability of a debt under 11 U.S.C. § 523(a)(2)(A) (Fil. No. 11). Trial was held in Lincoln, Nebraska, on October 26, 2022. James H. Truell appeared for the plaintiff, and John A. Lentz appeared for the defendant. Testimony was taken and the exhibits filed at docket numbers 22 through 32 were offered and received. The parties were directed to submit written closing arguments, which have been filed and the matter is now ready for decision.

For the reasons stated below, judgment will be entered in favor of the defendant.

**BACKGROUND**

This dispute arises from a $500,000 loan made to the debtor for the purpose of purchasing controlling interest in a small Kansas bank. The loan proceeds were not used solely for that purpose, for various reasons. The loan has not been repaid, and the creditor seeks to except it from discharge under § 523(a)(2)(A) as having been obtained through false pretenses or false representations.

The defendant, Jason Stephens, is a bank loan officer and executive. He became acquainted with the plaintiff Sheri Palmer and her late husband[1] in 2012 when he handled their farm operating loans. The Palmers continued to do business with him as he moved from Great Western Bank in Broken Bow, Nebraska, to Security State Bank in Ansley, Nebraska, to Heritage State Bank in

---

[1] Mr. Palmer passed away in 2014.

Broken Bow. As their loan officer, he was familiar with the couple's financial situation. He also became personal friends with the couple.

As part of their professional relationship, Stephens would advise Palmer[2] of various investment opportunities that he became aware of, including some deals that they considered investing in together. By early 2018, Stephens felt that the next step in his career advancement should be to move into bank ownership, making decisions at the executive level and helping to set the course for the organization's growth and profitability. After talking to experts in the field, he identified a small bank in Towanda, Kansas, as his best entry-level opportunity for pursuing that goal.

In April 2018, Stephens approached Palmer for a loan of enough money to purchase a controlling interest in the Towanda State Bank ("TSB"). The parties had various discussions about the terms of the loan over the ensuing months, and Palmer visited TSB and talked to its officers. Palmer agreed to lend $500,000 to Stephens, and Stephens drew up 10 promissory notes of $50,000 each based on loan documentation with which he was familiar from working in a bank.

On June 12, 2018, Stephens visited Palmer at her home where they signed the 10 notes and Palmer wrote him a check for $500,000. During the remainder of that calendar year, Stephens worked on gathering a team of advisers, investors, and a board of directors to assist him with his goal of purchasing controlling interest in TSB, and he tried to meet the necessary regulatory requirements. In December 2018, Stephens purchased 57.16 shares of TSB, which was estimated to be 24.5 percent of the total shares, for approximately $270,000.

In March 2019, the parties signed a new note for the principal amount of $500,000 naming the Palmer Trust as the lender.

By early August 2019, the parties' relationship had deteriorated. Unhappy that Stephens did not hold a controlling interest in TSB, Palmer began demanding repayment of the loan. She contacted TSB officers, bank regulators in Kansas and Nebraska, and others in the banking industry. Eventually TSB was sold to a third party and Stephens recovered only a fraction of what he had paid for his shares. Stephens filed the underlying Chapter 7 case in August 2021.

## LEGAL STANDARD

The Bankruptcy Code prohibits the discharge of a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition[.]" 11 U.S.C. § 523(a)(2)(A). Each of these bases of excepting a debt from discharge is distinct. *Jewell v. Lewis (In re Lewis)*, 637 B.R. 832, 854 (Bankr. W.D. Ark. 2022).

"A 'false pretense' involves implied misrepresentation or conduct intended to create and foster a false impression." *Merchants Nat'l Bank v. Moen (In re Moen)*, 238 B.R. 785, 791 (B.A.P.

---

[2] In this opinion, Sheri Palmer individually and the Sheri Palmer Revocable Trust will be referred to as Palmer except for those occasions where a distinction is necessary.

8th Cir. 1999) (quoting *In re Guy*, 101 B.R. 961, 978 (Bankr. N.D. Ind. 1988)). "[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the 'false pretenses' provision of Section 523(a)(2)(A)." *Moen* at 791 (quoting *In re Malcolm*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)).

To succeed on the false representation prong of the statute, the creditor must show, by a preponderance of the evidence, that the debtor (1) made a representation, (2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4) who justifiably relied on the representation, and which (5) proximately caused the creditor damage. *Hernandez v. General Mills Fed. Credit Union (In re Hernandez)*, 860 F.3d 591, 602 (8th Cir. 2017) (citing *Heide v. Juve (In re Juve)*, 761 F.3d 847, 851 (8th Cir. 2014)).

False representations may be by omission or commission. *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir. 1987), *abrogated on other grounds, Grogan v. Garner*, 498 U.S. 279 (1991). The key is whether the debtor knew the statement to be false at the time he made it. "Even if a false statement is made, no fraud exists unless the maker knows the statement is false at the time the statement is made." *Lindau v. Nelson (In re Nelson)*, 357 B.R. 508, 513 (B.A.P. 8th Cir. 2006). A promise to pay a debt in the future does not constitute a misrepresentation simply because the debtor failed to pay. *Clauss v. Church (In re Church)*, 328 B.R. 544, 547 (B.A.P. 8th Cir. 2005). However, a promise to pay without the present intention to do so could violate § 523(a)(2)(A). *Shea v. Shea (In re Shea)*, 221 B.R. 491, 497 (Bankr. D. Minn. 1998). Silence as to a material fact can also constitute a false representation under § 523(a)(2)(A). *Van Horne*, 823 F.2d at 1288.

For a debt to be excepted from discharge as a false representation, the creditor must have justifiably relied on the debtor's representation. "[J]ustifiable reliance is a different standard than reasonable reliance." *Hernandez*, 860 F.3d at 603. "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.* at 603-04 (citing *Field v. Mans*, 516 U.S. 59, 71 (1995)). "[A] victim of fraud is not justified in relying on a representation, and a duty to investigate arises, where 'the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived.'" *Id.* at 604 (quoting *Field*, 516 U.S. at 71).

"Actual fraud" encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation. *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 359 (2016). It is "anything that counts as 'fraud' and is done with wrongful intent." *Id.* at 360; *Lariat Cos., Inc. v. Wigley (In re Wigley)*, 15 F.4th 1208, 1211 (8th Cir. 2021).

> It is . . . sensible to start with the presumption that Congress did not intend "actual fraud" to mean the same thing as "a false representation[.]" . . . .
>
> . . . "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." *Neal v. Clark*, 95 U.S. 704, 709,

- 3 -

> 24 L. Ed. 586 (1878). "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." *Ibid.* Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."
>
> Although "fraud" connotes deception or trickery generally, the term is difficult to define more precisely. . . . There is no need to adopt a definition for all times and all circumstances here because, from the beginning of English bankruptcy practice, courts and legislatures have used the term "fraud" to describe a debtor's transfer of assets that, like Ritz' scheme, impairs a creditor's ability to collect the debt.

*Ritz*, 578 U.S. at 360.

While each of the bases for excepting a debt from discharge under section § 523(a)(2)(A) are distinct, each requires proof of the debtor's intent to deceive at the time the money is obtained.

> Because direct proof of intent (*i.e.*, the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred. *See* [*Webster City Production Credit Association v. Simpson (In re Simpson)*], 29 B.R. 202, 211 (Bankr. N.D. Iowa 1983). *Accord* [*Jordan v. Frye (In re Frye)*], 48 B.R. 422, 427 (Bankr. M.D. Ala. 1985); [*Municipal Credit Union v. Brown (In re Brown)*], 55 B.R. 999, 1004 (Bankr. E.D.N.Y. 1986). When the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor "cannot overcome [that] inference with an unsupported assertion of honest intent." [*Simpson*], 29 B.R. at 211–12. The focus is, then, on whether the debtor's actions "appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor." [*Heinold Commodities & Securities, Inc. v. Hunt (In re Hunt)*], 30 B.R. 425, 441 (M.D. Tenn. 1983).

*Van Horne*, 823 F.2d at 1287–88.

As will be shown below, actual fraud is not at issue in this case. Rather, the focus is on false pretenses and false representation, and whether the plaintiff is able to prove either.

## FINDINGS OF FACT

Stephens has been employed in the banking industry since 2007. The parties agree that Stephens told Palmer in the spring of 2018 of his interest in purchasing a bank. He consulted advisers and settled on TSB as a viable target. Based on his years of experience in agricultural lending, he identified an untapped revenue source for the bank in making loans backed by the Farm Service Agency. According to Stephens, investors are willing to buy that FSA guarantee, resulting in profits for the bank. TSB did not make many, if any, agricultural loans, so Stephens saw a prodigious growth opportunity there that he intended to capitalize on after he took the reins at the bank.

After visiting TSB and determining that it was operating successfully, Palmer agreed to loan Stephens $500,000 to purchase a controlling interest in the bank. The parties met at Palmer's house on June 12, 2018, to sign promissory notes. The parties agree that 10 notes, each for $50,000 and with a maturity date of June 11, 2028, were signed that day. The parties also generally agree as to the terms included in those notes: an interest rate of 1.25 percent over prime rate, with a floor of 6 percent and a ceiling of 10 percent; collateral to include the TSB shares purchased by Stephens and a life insurance policy on Stephens with Palmer named as a beneficiary; a repayment schedule; and a provision concerning the debtor's default.

The terms of the notes required 40 quarterly "interest-only" payments, with the first payment due "at the end of the first full quarter after bank acquisition." Prepayment could occur only by mutual agreement, which was a term requested by Palmer.

A provision in the notes identified the debtor's insolvency, bankruptcy, incompetency, death, and failure to make a payment when due or perform any conditions of the agreement as events of default, but the notes do not contain any language giving Palmer a remedy in the event of default. The parties also agreed the loan would be immediately due if Stephens sold his interest in the bank.

The notes provided that the loan was secured by "Property describe as Term Life Insurance with death benefit to match the original loan amount of $50,000.00 and to match the term of the loan of ten years."

Palmer wrote Stephens a check for $500,000 on that date, after the notes were signed.

Palmer testified that the reason for 10 separate notes was because Stephens said it would be simpler as he repaid the loan to mark each note paid rather than re-write and re-amortize one large note. Both parties testified that Stephens drafted the notes, using the format of other loan documents he was familiar with in his profession. Both parties also testified they discussed the loan and the notes extensively, both in the weeks between Stephens' request for the loan and Palmer's agreement to make the loan and on the day Stephens brought the notes to Palmer's house to be signed. Stephens testified that Palmer is "very analytical" and thinks deeply before making big decisions. He testified that he spent hours with her, answering her questions before she signed the notes; Palmer does not dispute this.

The parties strongly disagree on what happened to those 10 original notes. Palmer is adamant that the copies of the 10 notes in the record at Filing 23 are not faithful copies. She identified provisions she claims were in the originals that are missing in these copies, in particular paragraphs 13 and 14, and the alteration of paragraph 8. Palmer asserts Stephens tore up the originals in her presence in March 2019 when the parties signed a new note; Stephens denies this and testified that he does not know what happened to the original 10 notes. In the context of this decision, the whereabouts of the initial 10 notes is irrelevant; the note at issue here is the March 2019 promissory note since there is no dispute that it replaced the original 10 separate notes.

The parties signed a new promissory note on March 12, 2019. Palmer testified that its content is the same as the initial 10 notes – the only difference was to identify the trust as the lender, rather than Palmer individually.

Over the course of the latter half of 2018 and early 2019, Stephens was organizing his efforts concerning TSB while simultaneously dealing with some personal challenges. He testified that he did a lot of legwork to try to facilitate his purchase of the bank. He was put in touch with Jon Pope, who has decades of experience as the owner of a number of banks in Kansas. Pope advised Stephens on the nuts and bolts of buying a bank, and advised him to hire a consultant, which Stephens did.

One hurdle Stephens faced with regard to the bank purchase was regulatory. The FDIC does not let just anyone buy a bank. Rather, there are strict requirements regarding such things as the available equity of potential buyers and the expertise of the bank's proposed directors. The banking regulations concerning the experience and expertise of the board of directors led Stephens to attempt to recruit board members who were familiar with ag lending, given Stephens' intent to adjust TSB's loan portfolio in that direction. Either Pope or the consultant advised Stephens that a buyer could purchase up to 25 percent of a bank's shares without FDIC approval.

These efforts naturally required time and money, for consulting fees, travel to meetings, and so forth. Stephens testified that he was transparent with Palmer about these efforts and kept her apprised of the individuals he was meeting with and what he was learning. He also testified (without providing any detail or specifics) that he used some of the loan proceeds for these expenses. He resigned from his job at the Almena State Bank in Kansas in order to devote more time to his pursuit of TSB. He was hired as the temporary chief financial officer of a friend's manufacturing company, which gave Stephens the flexibility to work on buying TSB.

Ultimately, Stephens purchased 57.16 shares of TSB, approximately 24.5 percent of the total shares, for approximately $270,000 in December 2018. He used some of the Palmer loan proceeds for this purchase.

At the same time, Stephens' young daughter was ill. She was treated in hospitals in Denver and in Omaha – both cities some distance from where the family was residing at the time. In November 2018, she entered a hospital in Omaha, where she passed away in January 2019. Stephens testified that Palmer gave him permission to use some of the loan proceeds for expenses associated with his daughter's illness, which he did.

By August 2019, Palmer was suspicious of Stephens' motives for requesting the loan. Upset because she believed Stephens should have used the entire amount of the loan to purchase a controlling interest in TSB, she demanded repayment. When Stephens was unable to repay the principal, Palmer undertook other efforts to recover her money. This included contacting TSB's majority shareholders, some of Stephens' advisers, people he had contacted about joining TSB's board of directors, and the state banking regulators in Kansas and Nebraska.

Stephens testified that these activities worsened his problems. While he was trying to get FDIC approval to purchase more TSB shares, he testified that potential investors and board

members withdrew, due to the alleged slander spread by Palmer. While that may or may not have been a factor, by the fall of 2019, the bank deal fell apart. The majority owners eventually sold TSB to a third party at a reduced price. Stephens testified that he received less than $70,000 for his shares, which he turned over to Palmer.

Stephens filed the underlying Chapter 7 petition on August 16, 2021. By that time, he and his wife were going through a divorce, and Palmer had filed a collection lawsuit in state court.

On Schedule A/B, an estimated $70,000 in net proceeds from the sale of the bank shares is listed, with a note that the sale had recently closed and the proceeds would be surrendered to Palmer. On Schedule D, the debtor listed the Palmer debt in the amount of $564,549.69, less the $70,000 in sale proceeds, for an unsecured balance of $494,549.69.

Palmer filed a proof of claim in the bankruptcy case on September 21, 2021, for $500,000, of which $66,000 was listed as secured by the life insurance policy and bank stock, with the remaining $434,000 being unsecured.

Palmer filed this adversary proceeding on November 8, 2021.

## CONCLUSIONS OF LAW

Palmer's allegations fall under the false pretenses or false representation prongs of § 523(a)(2)(A). Palmer firmly believes Stephens was going to use the full amount of the loan proceeds to promptly purchase a controlling interest in TSB; because he did not use the loan for that purpose, she believes he defrauded her. "Exceptions to discharge under § 523(a) are to be strictly and narrowly construed against the creditor and liberally in favor of the debtor to facilitate the debtor's fresh start." *Lopez Hernandez v. Sulier (In re Sulier)*, 541 B.R. 867, 877 (Bankr. D. Minn. 2015) (citing *Reshetar Sys., Inc. v. Thompson* (*In re Thompson*), 686 F.3d 940, 944 (8th Cir.2012)). Using those standards, the preponderance of the evidence before the court does not demonstrate that Stephens intended to deceive Palmer at the time the loan was made, the debt is dischargeable.

The testimony by both parties was clear that at the time the loan was made, Stephens' plan was to purchase a controlling interest in TSB. Upon receipt of the funds, he immediately went to work on the purchase. Unfortunately, subsequent circumstances prevented the purchase from happening. The path to bank ownership turned out not to be as simple as Stephens naively anticipated. As noted in the previous section, the FDIC is involved any time there is a change of control of a financial institution. Stephens was able to buy a minority interest in the bank, but was unable to satisfy the FDIC requirements for a change in control. Ultimately, the deal to purchase a controlling interest fell apart, and the parties each expressed their opinions as to the cause. Regardless, the controlling purchase did not happen despite evidence that Stephens made efforts to do so.

Palmer also testified extensively as to alleged misrepresentations made by Stephens with regard to the collateral (life insurance policy and bank shares) intended to secure the loan. The evidence does not support her assertion that such representations were false or made with the intent

to deceive. At most, the discrepancies arise from a failure to agree (or the failure to stick to a decision) on the details.

None of the evidence proves Stephens deliberately and intentionally made a knowingly false representation to Palmer for the purpose of deceiving her at the time she made the loan to him. His intent at the time he obtained the funds from Palmer is the key, and at that time, the evidence indicates Stephens did intend to use the money to buy a bank. He may have been naïve, misguided, overly confident, or even ignorant as to the process--but, the evidence does not indicate fraudulent intent. In fact, Stephens did partially achieve his goal of buying an ownership interest in a bank, with the use of Palmer's funds. The deal to buy a controlling interest in the bank simply did not work out. A failed business deal is not automatically fraudulent; it is simply a failed deal.

The evidence also suggests both parties were more than a little sloppy in documenting this loan, with Stephens being overconfident in his loan-writing abilities. Moreover, it is astonishing that Palmer was unwilling to seek professional advice regarding a financial transaction of this size. Palmer testified repeatedly that she has no particular expertise concerning large financial transactions or operating a bank, yet she refused (or at least failed) to have legal counsel look at the promissory notes before she signed them, and she satisfied herself that TSB was a good investment simply by visiting the premises and speaking with the owners, but not reviewing a single piece of financial information.

Even if Palmer were able to show that Stephens had made a false representation, or knowingly failed to correct her false impressions, she cannot establish justifiable reliance. She failed to fulfill her duty to investigate the representations made and to perform due diligence. It is an expensive lesson to learn in this case.

## CONCLUSION

IT IS ORDERED: The plaintiff has not established the necessary elements to except this debt from discharge under 11 U.S.C. § 523(a)(2)(A). Judgement will be entered in the defendant's favor.

Date: December 12, 2022.

BY THE COURT:

/s/Thomas L. Saladino
Chief Judge

Notice given by the court to:
*James H. Truell
John A. Lentz
United States Trustee

*Movant is responsible for giving notice to other parties if required by rule or statute.